FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHWESTERN DIVISION**

00 MAR 31  PM 4: 49

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| **RICHARD L. CHALAL, M.D.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No: CV 98-B-2687-NW** |
| | ) | |
| **NORTHWEST MEDICAL** | ) | |
| **CENTER, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ENTERED**

APR – 3 2000

## MEMORANDUM OPINION

This case presents claims by Richard L. Chalal ("Dr. Chalal" or "plaintiff") against

Northwest Medical Center, Inc. ("the Hospital" or "defendant") arising from the Hospital's

termination of the plaintiff's medical staff privileges. Currently before the court is the

defendant's motion for summary judgment,[1] which is based primarily on the Health Care Quality

Improvement Act of 1986 ("HCQIA"), 42 U.S.C. §§ 11101 through 11152. Upon consideration

of the record, the submissions of the parties, the argument of counsel, and the relevant law, the

court is of the opinion that defendant's motion for summary judgment is due to be granted.

---

[1] The defendant filed a Motion for Summary Judgment on May 6, 1999, and an Amended
Motion for Summary Judgment on July 19, 1999. For purposes of this opinion, the court will
treat the two motions as a single motion for summary judgment.

## BACKGROUND

### I. FACTUAL SUMMARY

The facts of this case are largely undisputed.  Defendant Northwest Medical Center, Inc. operated a hospital located in Russellville, Alabama.[2]  (Deposition of Christine Stewart ("Stewart Dep.") at 153-54, submitted with Pl.'s Second Evid. Sub. in Resp. to Def.'s Mot. for Summ. J. and Pl.'s Opp. Thereto.)  In 1995, the Hospital recruited Plaintiff Richard L. Chalal, M.D., a physician specializing in internal medicine, to relocate his practice from Florida and become a member of the Hospital's medical staff.  (Deposition of Richard L. Chalal ("Chalal Dep." or "DX1") at 6, 90-92, Ex. 1 of Def.'s Evid. Sub. in Supp. of Mot. for Summ. J.;[3] Recruiting Agreement and Recruiting Agreement Addendum - Relocation, attached as Ex. 7 to Chalal Dep.) Dr. Chalal and the Hospital entered into a Recruiting Agreement and a Professional Services Agreement, both of which were contingent upon Dr. Chalal maintaining privileges on the Hospital's medical staff.  (Recruiting Agreement, attached as Ex. 7 to Chalal Dep.; Professional Services Agreement, attached as Ex. 8 to Chalal Dep.)

Dr. Chalal applied for staff privileges and was initially appointed to the Hospital's medical staff as a provisional member beginning October 2, 1995.  (Chalal Dep. at 11, 90-92.) The Hospital's medical staff is governed by Medical Staff Bylaws ("the Bylaws"), which provide that all initial appointments to the medical staff shall be "provisional" for at least 12 months.

---

[2]  Subsequent to the events underlying this litigation, Northwest Medical Center, Inc. sold the hospital to an entity not a party to this action.  Thus, the sole defendant no longer owns or operates the hospital.

[3]The evidence submitted in Defendant's Evid. Sub. in Supp. of Mot. for Summ. J. will hereinafter be identified with a DX and the corresponding number of the exhibit.

(DX4, Med. Staff Bylaws ("the Bylaws") at 12, Art. IV, Sec. 2, ¶ H.)  The Bylaws require that

the chairman of the medical section to which a provisional member is assigned observe and

evaluate the new member's professional and clinical performance.  (*Id.*)  To this end, the Bylaws

state that a "proctorship" or other supervision during the provisional period is not considered an

adverse action of the medical staff.  (*Id.* at 23, Art. VI, Sec. 6, ¶ A.)  At the conclusion of the

provisional period, the Bylaws require the medical staff to determine whether to advance the

physician from provisional status to "active" status.  (*Id.*)

During Dr. Chalal's provisional year, a number of clinical incidents occurred which

caused members of the medical staff to question Dr. Chalal's competency as a physician.  (Letter

to Dr. Chalal, attached as Ex. 2 to Chalal Dep.; Summary listing of incidents attached to Def.'s

Reply in Supp. of Mot. for Summ. J.)  In March of 1996, and again in May of 1996, the medical

staff conducted peer review meetings to review certain incidents in which Dr. Chalal's patients

suffered poor outcomes.[4]  (*See* Letter to Dr. Chalal, attached as Ex. 4 to Chalal Dep.;

Memorandum to Dr. Chalal, attached as Ex. 5 to Chalal Dep.; Letter to Dr. Chalal, attached as

Ex. 6 to Chalal Dep.)  After the second peer review meeting, the medical staff elected to place

---

[4] Under Alabama law, all information furnished to any peer review committee, and any findings, conclusions, or recommendations by a peer review committee, are privileged and not available for discovery.  *Ala. Code* § 6-5-333; *see also Ala. Code* § 34-24-58.  In this case, because Dr. Chalal alleged that the Hospital conducted peer review improperly, the parties agreed that the hospital was entitled to utilize confidential peer review material in its defense of Dr. Chalal's claims, subject to a protective order preventing this peer review material from being utilized outside of this proceeding.  On March 16, 1999, the court entered such a protective order.  Accordingly, this opinion does not discuss the specifics of any peer review material or findings involved in this case.  The court's decision, however, is based on a full review of the relevant peer review materials submitted under seal.

3

Dr. Chalal on a proctorship, which did not limit his staff privileges but required Dr. Chalal to have his hospital admissions reviewed by another member of the medical staff. (Letter to Dr. Chalal, attached as Ex. 6 to Chalal Dep.; Chalal Dep. at 92-94.)

As his one-year provisional period came to an end, Dr. Chalal applied for advancement to active staff membership. (Chalal Dep. at 90-92.) Pursuant to the procedure outlined in the Bylaws, Dr. Chalal's application was first reviewed by the medical staff's Executive Committee, whose function was to make a recommendation to the Hospital's Board of Trustees. (Bylaws at 9-12, Art. IV, Sec. 1-3; Bylaws at 50-51, Art. XIII, Sec. 1, ¶ B.) The Executive Committee met on September 26, 1996, and again on October 8, 1996, and recommended that Dr. Chalal's application be denied based on the clinical incidents which had occurred during Dr. Chalal's first year. (Letter to Dr. Chalal, attached as Ex. 3 to Chalal Dep.; Letter to Dr. Chalal, attached as Ex. 14 to Chalal Dep.) On October 9, 1996, the Hospital's Chief Executive Officer, Christine Stewart, informed Dr. Chalal in writing of the adverse recommendation, stating that the Executive Committee based its decision in part on "the aggregate (and excessive) number of 'incidents' concerning clinical care and competency reported during the first year of your staff membership. . . ." (Ex. 14 attached to Chalal Dep.) The Hospital CEO also informed Dr. Chalal that, pursuant to the Bylaws, he was entitled to request a hearing. (*Id.*)

Dr. Chalal requested a hearing, and a Hearing Committee was appointed to review the adverse recommendation of the Executive Committee. (Chalal Dep. at 18-19, 29; Letter to Dr. Chalal attached as Ex. 2 to Chalal Dep.) As provided by the Bylaws, the Hearing Committee was composed of five physicians on active staff who were not members of either the Executive Committee or the Hospital's Board of Trustees. (Chalal Dep. at 29; Bylaws at 30, Art. III, Sec.

4

5.)  By letter dated October 24, 1996, approximately seven weeks prior to the hearing, the Hospital CEO provided Dr. Chalal with a summary of the incidents giving rise to the Executive Committee's adverse recommendation, specifying the particular patient charts and witnesses involved.  (Chalal Dep. at 18-19, 32; Ex. 2 attached to Chalal Dep.)

The Hearing Committee convened on December 18, 1996.  (DX2, Transcript of Hearing ("Hearing Transcript") at 1.)  The hearing lasted three hours, documented in a 140-page transcript.  (Hearing Transcript at 1-140.)  During the hearing, the five Hearing Committee physicians and Dr. Chalal engaged in a thorough case review of each clinical incident outlined in the summary chart.  (*Id.*)  The Hearing Committee physicians reviewed the actual patient charts involved in the cases at issue, to which Dr. Chalal had been given full access in order to prepare for the hearing.  (*Id.*; Chalal Dep. at 32.)  No witnesses were called by either Dr. Chalal or the Executive Committee, and neither party was represented by an attorney.  (Chalal Dep. at 26-28, 31-32; Hearing Transcript at 1-140.)  However, the hearing transcript reflects that the Hearing Committee conducted an exhaustive professional review of the clinical incidents, allowing Dr. Chalal to present as much information or explanation regarding the incidents as he desired. (Hearing Transcript at 1-140.)

The Hearing Committee concurred with the adverse recommendation by the Executive Committee.  (Report of Hearing Committee, attached as Ex. 13 to Chalal Dep.)  The Hearing Committee issued a written recommendation stating "after careful review of the specific cases and incidents involving Dr. Chalal submitted by the Medical Executive Committee during the Hearing, the Hearing Committee in good faith finds that these specific cases and incidents demonstrate that Dr. Chalal's level of clinical care and competency is unacceptable." (*Id.*) Dr.

5

Chalal received a copy of the Hearing Committee's written adverse recommendation. (*Id.*)

On December 20, 1996, Dr. Chalal's application came before the Hospital's Board of Trustees, along with the adverse recommendations of the Executive Committee and the Hearing Committee. (Letter to Dr. Chalal and Hand Delivery Receipt, attached as Ex. 12 to Chalal Dep.) The Board of Trustees voted to adopt the adverse recommendations of the respective medical staff committees. (*Id.*) Accordingly, Dr. Chalal's hospital privileges were terminated, effective immediately. (*Id.*) The Hospital CEO gave Dr. Chalal written notice that his staff privileges had been terminated and informed him of his right to appellate review, as provided by the Bylaws. (*Id.*) The Hospital CEO subsequently notified Dr. Chalal that his Professional Services Agreement was terminated as a result of Dr. Chalal's loss of his staff privileges. (Affidavit of Christine Stewart, ("Stewart Aff.") at ¶ 5, attached to def.'s Supp. Evid. Sub. in Supp. of Amended Mot. for Summ. J.) As required by the Health Care Quality Improvement Act, 42 U.S.C. § 11133, and Alabama state law, *Ala. Code* § 34-24-59, the Hospital reported the termination of Dr. Chalal's staff privileges to the Alabama State Board of Medical Examiners for inclusion in the National Practitioner Data Bank.[5] (Stewart Dep. at 50-55.)

---

[5] 42 U.S.C. § 11133 provides that "[e]ach health care entity which. . . takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days . . . shall report [such] to the Board of Medical Examiners. . . ." Similarly, *Ala. Code* § 34-24-59(a) provides that "[t]he chief administrative officer of each hospital shall report to the Alabama State Board of Medical Examiners any disciplinary action taken concerning any physician when the action is related to professional ethics, medical incompetence, moral turpitude, or drug or alcohol abuse." Further, "the individual making the report shall be immune from liability." *Ala. Code* § 34-24-59(c). Under HCQIA, all such reports are included in the National Practitioner Data Bank, a national information clearinghouse established by HCQIA "to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101; *see also* 42 U.S.C. §§ 11133-34.

Dr. Chalal noticed an appeal of the decision in accordance with the Bylaws, and an Appellate Review Committee made up of three additional physicians was appointed to review the adverse decision.  (Letter to Board of Trustees, DX3; Bylaws at 32-34, Art. VIII, Sec. 7, ¶¶ A-J.)  After a review of the record and consideration of Dr. Chalal's written submission, on January 23, 1997, the Appellate Review Committee affirmed the Board of Trustees's decision.  (*Id.*; DX3)

During this same time period, Dr. Chalal also applied for medical staff privileges at another area hospital, Helen Keller Hospital.  (Chalal Dep. at 12-13, 17-16.)  Dr. Chalal requested that the defendant Hospital supply reference information to Helen Keller Hospital.  (Stewart Aff. at ¶ 7; Chalal Dep. at 198-201.)  The defendant Hospital sent a draft letter of reference to Dr. Chalal on March 17, 1997 for his prior approval, which read in relevant part as follows:

> Dr. Chalal was a provisional member of the medical staff of Northwest Medical Center from 9/29/95 to 12/20/96.  The Board of Trustees denied his application for advancement to active staff and terminated his provisional staff membership, because on numerous occasions Dr. Chalal exercised improper judgment in caring for patients.

(Letter Attached as Ex. B to Stewart Aff., submitted with Def.'s Supp. Evid. Sub. in Supp. of Amended Mot. for Summ. J.)  The Hospital informed Dr. Chalal that it would not send the draft letter unless Dr. Chalal approved the letter and released the Hospital from liability in connection with sending the letter of reference.  (Stewart Aff. at ¶ 7 and Letter attached as Ex. B. to Stewart Aff.; Chalal Dep. at 200-01.)  The Hospital submitted a  proposed release to Dr. Chalal, which provided:

7

> In consideration of [the Hospital] providing a letter of reference to Helen Keller
> Hospital, a copy of which is attached hereto as Exhibit A, the undersigned
> acknowledges that he has reviewed the letter of reference and authorizes its being
> delivered to the addressee, and hereby releases [the Hospital] . . . from any
> liability in connection with the attached letter of reference, and agrees to
> indemnify and hold harmless [the Hospital] for any and all reasonable attorney's
> fees, which are related to or arise out of the attached letter of reference.

(Release and Indemnification Agreement, attached to Stewart Aff.)   Dr. Chalal refused to sign

the release, believing that it would have released the Hospital from liability relating to the

termination of his staff privileges. (Chalal Dep. at 200-01.) Dr. Chalal admitted, however, that

he did not want the Hospital to send the proposed letter of reference. (*Id.* at 202.)

Dr. Chalal alleges that after the Hospital terminated his staff privileges, Hospital

employees made defamatory remarks to certain of his patients, allegedly stating that Dr. Chalal's

medical care "wasn't good" and that the patients should seek other doctors. (Chalal Dep. at 203-

204; Complaint at 4, ¶¶ 15(C)-15(D).)   As proof of this allegation, Dr. Chalal submitted

affidavits from six patients, Carol Higgins, Thomas Ragsdale, Bessie Searcy, Beatrice J.

Ricketts, Theresa Brewer, and Barbara Adams.[6] ( *See* Affidavits of Carol Higgins, Thomas

Ragsdale, Bessie Searcy, Beatrice J. Ricketts, and Theresa Brewer submitted with Pl.'s Second

Evid. Sub. in Response to Def.'s Mot. for Summ. J. and Pl.'s Opp. Thereto and Affidavit of

Barbara Adams submitted with Supp. Sub. to Pl.'s Second Evid. Sub. in Response to Def.'s Mot.

for Summ. J. and Pl.'s Opp. Thereto)   Most of the affidavits simply reflect that when Dr.

Chalal's patients sought to be admitted to the Hospital after his staff termination, the Hospital

---

[6] As discussed more fully below, the court granted the Hospital's motion to strike these
affidavits for failure to comply with discovery deadlines.   Even if the affidavits are considered,
however, as a matter of law they do not support the claims against the Hospital.

informed them Dr. Chalal could no longer admit patients to the Hospital and they would need to get another doctor in order to be admitted. (*Id.*)

## II. PLAINTIFF'S CLAIMS

On October 2, 1998, Dr. Chalal filed a six-count complaint against the Hospital alleging various federal and state claims, all based on the Hospital's conduct in terminating his medical staff privileges as outlined above.[7]  Count One of the complaint alleges that the Hospital failed to comply with the requirements for peer review under HCQIA, 42 U.S.C. §§ 11101 through 11152. (Complaint at 4-5, ¶¶ 17-18.)  Count Six claims a violation of federal antitrust law.[8] (Complaint at 10-11, ¶¶ 36-37.)  The remaining counts assert state law claims as follows: tortious interference with the Hospital's own contract with Dr. Chalal (Count Two); defamation (Count Three); tortious interference with Dr. Chalal's contractual relationship with his patients (Count Four); and outrage (Count Five).  (Complaint at 6-9, ¶¶ 21-23, 25-26, 28-29, 30-34.)  Although the complaint seeks both monetary and injunctive relief, Dr. Chalal never moved the court for an injunction or otherwise pursued injunctive relief.

## DISCUSSION

### I. HEALTH CARE QUALITY IMPROVEMENT ACT

In 1986, Congress passed the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11101 through 11152, in order to encourage peer review proceedings by which

---

[7]   The complaint was originally filed in state court, but the defendant removed the case to this court based on federal question jurisdiction, 28 U.S.C. § 1331.

[8]  Although the complaint is somewhat vague, Plaintiff's Response in Opposition to Defendant's Amended Motion for Summary Judgment explains that his antitrust claim is for violation of the Sherman Act, 15 U.S.C. § 1.

9

hospitals evaluate and discipline staff physicians. *Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d 1318, 1321 (11th Cir. 1994) (citing H.R. Rep. No. 903, 99th Cong., 2d Sess. 2, reprinted in 1986 U.S.C.A.A.N. 6287, 6384). Prior to the passage of HCQIA, the threat of litigation from disciplined doctors seriously thwarted effective hospital peer review procedures. *Id.* Congress found that "[t]he threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review." 42 U.S.C. § 11101(4). Accordingly, HCQIA provides that if a "professional review action" meets certain due process and fairness requirements, then those participating in such a review process shall not be liable under any state or federal law for monetary damages. 42 U.S.C. § 11111(a)(1).[9]

In order to qualify for the immunity under HCQIA, a professional review action must be taken–

    (1)    in the reasonable belief that the action was in the furtherance of quality health care,

    (2)    after a reasonable effort to obtain the facts of the matter,

    (3)    after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under

---

[9] Specifically, HCQIA provides as follows:

    If a professional review action . . . of a professional review body meets all the standards specified in section 11112(a) of this title, . . .

        (A)    the professional review body,

        (B)    any person acting as a member or staff to the body,

        (C)    any person under a contract or other formal agreement with the body, and

        (D)    any person who participates with or assists the body with respect to the action,

    shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.

42 U.S.C. § 11111(a)(1).

the circumstances, and

(4)     in the reasonable belief that the action was warranted by the facts known
        after such reasonable effort to obtain facts and after meeting the
        requirement of paragraph (3).

42 U.S.C. § 11112(a).

HCQIA creates a rebuttable presumption of immunity in favor of the reviewing body:

"[a] professional review action shall be presumed to have met the preceding standards necessary

for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a

preponderance of the evidence." 42 U.S.C. § 11112(a).  In addition, HCQIA's reasonableness

requirements "create an objective standard of performance, rather than a subjective good faith

standard." *Bryan v. James E. Holmes,* 33 F.3d at 1323.

As a preliminary matter, in the present case the defendant Hospital's termination of Dr.

Chalal's privileges clearly constitutes a "professional review action" within the ambit of HCQIA.

The statute defines "professional review action" as follows:

> an action or recommendation of a professional review body which is taken or
> made in the conduct of professional review activity, which is based on the
> competence or professional conduct of an individual physician (which conduct
> affects or could affect adversely the health or welfare of a patient or patients), and
> which affects (or may affect) adversely the clinical privileges . . . of the physician.
> Such term includes a formal decision of a professional review body not to take an
> action or make a recommendation described in the previous sentence and also
> includes professional review activities relating to a professional review action.

42 U.S.C. § 11151(9).   The Hospital is a "professional review body," which is defined in

HCQIA as "a health care entity and the governing body or any committee of a health care entity

which conducts professional review activity, and includes any committee of the medical staff of

such an entity when assisting the governing body in a professional review activity." 42 U.S.C. §

11151(11). HCQIA further defines the term "health care entity" to include "a hospital that is

11

licensed to provide health care services by the State in which it is located." 42 U.S.C. §

11151(4)(A)(i). Accordingly, as agreed upon by the parties, if the due process and fairness

requirements set forth in 42 U.S.C.A § 11112(a) are met, then the Hospital is entitled to

HCQIA's immunity from monetary damages. *See Bryan v. James E. Holmes,* 33 F.3d at 1334;

*see also Sugarbaker v. SSM Health* Care, 190 F.3d 905, 912 (8th Cir.1999); *Imperial v.*

*Suburban Hosp. Ass'n, Inc.*, 37 F.3d 1026 (4th Cir. 1994); *Smith v. Ricks*, 31 F.3d 1478, 1487

(9th Cir. 1994).

## II. SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548,

2552, 91 L. Ed. 2d 265 (1986). The movant can meet this burden by presenting evidence

showing there is no dispute of material fact, or by showing the nonmoving party has failed to

present evidence in support of some element of his case on which he bears the ultimate burden of

proof. *Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552-53; *see* Fed. R. Civ. P. 56(a) and (b).

Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S. Ct. at 2552.

In a case involving a question of immunity under HCQIA, however, the statute's

presumption of immunity shifts the burden of proof on summary judgment *to the physician* to

show that the professional review action failed to meet the due process and fairness requirements

set forth in 42 U.S.C. § 11112(a). *Bryan v. James E. Holmes,* 33 F.3d at 1332 n.25. "In a sense, the presumption language in HCQIA means that the plaintiff bears the burden of proving that the peer review process was not reasonable." *Id.* Under Eleventh Circuit jurisprudence, the standard of review for summary judgment under HCQIA as follows: "Might a reasonable jury, viewing the facts in the best light for the plaintiff, conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?" *Id.* (quoting *Austin v. McNamara,* 979 F.2d 728, 734 (9th Cir. 1992)). HCQIA immunity is a question of law for the court to decide and may be resolved whenever the record in a particular case becomes sufficiently developed. *Bryan v. James E. Holmes,* 33 F.3d at 1332.

### III. HOSPITAL IMMUNITY UNDER HCQIA

Dr. Chalal has failed to present any evidence which would even suggest that the Hospital's decision to terminate his staff privileges was not reasonable and in full compliance with the due process and fairness requirements set forth in 42 U.S.C.A § 11112(a). To the contrary, the record overwhelmingly reflects that the Hospital's decision was reasonable, based on a legitimate concern for patients, supported by facts and medical evidence, and reached only after proper notice and hearing procedures were afforded to Dr. Chalal. Accordingly, the Hospital is immune under HCQIA from monetary liability for its decision to terminate Dr. Chalal's staff privileges and the mandatory reporting thereof to the National Practitioner Data Bank under 42 U.S.C. § 11133 and *Ala. Code* § 34-24-59. The court will discuss each of the four requirements for immunity under 42 U.S.C.A § 11112(a) in turn.

(1)     The Hospital Acted In The Reasonable Belief That The Action Was In The
        Furtherance Of Quality Health Care

There is no evidence on record to suggest that the Hospital did not act "in the reasonable

belief that the action was in the furtherance of quality health care," 42 U.S.C. § 11112(a)(1). The

Hospital's decision was based on the recommendations of two separate physician peer review

committees, the Executive Committee and the Hearing Committee, each concluding that Dr.

Chalal's clinical care and competency was unacceptable.  Both committees reviewed Dr.

Chalal's performance in the clinical incidents at issue and concluded that Dr. Chalal was not

sufficiently competent to remain on the Hospital's medical staff.  As noted above, while the court

declines to detail the specific clinical incidents in light of the peer review privilege, the court has

reviewed under seal the clinical incidents at issue and the transcript of the Hearing Committee's

review of these incidents.  Based on the court's review, it is evident that the concerns raised by

the committee members involve serious issues of clinical competency and patient welfare.

In Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment as well as

Plaintiff's Response in Opposition to Defendant's Amended Motion for Summary Judgment, Dr.

Chalal did not discuss these medical incidents with the court, nor did he offer any evidence that

the physician committee member's adverse recommendations were not medically reasonable.

Although Dr. Chalal suggested during the Hearing Committee meeting that he had obtained a

favorable independent review of his actions from physician consultants at Vanderbilt University

and University of Alabama at Birmingham, Dr. Chalal refused to name the consultants when

asked by the Hearing Committee, and declined the committee's request to speak with these other

physicians. (Chalal Dep. at 21-27; Hearing Transcript at 35-39.)  As noted above, the

14

reasonableness of the Hospital's decision is measured under "an objective standard," *Bryan v. James E. Holmes*, 33 F.3d at 1323, and there is simply no evidence to suggest that the Hospital, which followed the recommendations of two physician peer review committees, was not acting in the reasonable belief that the action was in the furtherance of quality health care.

  (2)  *The Hospital Acted After A Reasonable Effort To Obtain The Facts Of The Matter*

  The evidence reflects that the Hospital terminated Dr. Chalal's privileges only "after a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2). The Hospital terminated Dr. Chalal's staff privileges after the matter was carefully reviewed by the Executive Committee and the Hearing Committee. Both committees conducted a thorough review of the patient charts at issue before making an adverse recommendation. Moreover, the Hearing Committee's recommendation was made after a hearing during which Dr. Chalal was allowed to put forth any and all evidence he desired. (Chalal Dep. at 31-32.) The Hospital's decision was then affirmed by a third physician peer review committee, the Appellate Review Committee. (DX3.) The court finds that Dr. Chalal has failed to meet his burden of showing that the Hospital acted without making a reasonable effort to determine the facts.

  (3)  *Adequate Notice and Hearing Procedures Were Afforded to Dr. Chalal*

  Dr. Chalal similarly presented no evidence that the Hospital failed to meet the third requirement under section 11112(a) of "adequate notice and hearing procedures. . .or [] such other procedures as are fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3). With respect to this requirement, HCQIA contains a "safe harbor" provision which outlines a detailed checklist of certain procedural guidelines which, if followed, will satisfy the adequate notice and hearing requirement of 42 U.S.C. § 11112(a)(3). The "safe harbor" provision

15

provides as follows:

> A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):

(1)     Notice of proposed action

> The physician has been given notice stating–

(A)(i)  that a professional review action has been proposed to be taken against the physician,

(ii)    reasons for the proposed action,

(B)(i)  that the physician has the right to request a hearing on the proposed action,

(ii)    any time limit (of not less than 30 days) within which to request such a hearing, and

(C)     a summary of the rights in the hearing under paragraph (3).

(2)     Notice of hearing

> If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating–

(A)     the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

(B)     a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3)     Conduct of hearing and notice

> If a hearing is requested on a timely basis under paragraph (1)(B)--

(A)     subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)--

(i)     before an arbitrator mutually acceptable to the physician and the health care entity,

(ii)    before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

(iii)   before a panel of individuals who are appointed by the entity and are not in direct competition with the physician involved;

(B)     the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

    (C)    in the hearing the physician has the right–

        (i)    to representation by an attorney or other person of the physician's choice,

        (ii)    to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

        (iii)    to call, examine, and cross-examine witnesses,

        (iv)    to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

        (v)    to submit a written statement at the close of the hearing; and

    (D)    upon completion of the hearing, the physician involved has the right–

        (i)    to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

        (ii)    to receive a written decision of the health care entity, including a statement of the basis for the decision.

42 U.S.C. § 11112(b).

      While meeting the foregoing "safe harbor" guidelines assures satisfaction of the adequate notice and hearing requirement under 42 U.S.C. § 11112(a)(3), Congress was careful to point out that "[a] professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute a failure to meet the standards of subsection (a)(3) of this section." 42 U.S.C. § 11112(b).   If other procedures are followed, but are not precisely of the character spelled out in section 11112(b), the test of adequate notice and hearing procedures may still be met under the circumstances. *Bryan v. James E. Holmes*, 33 F.3d at 1336 (citing H.R. Rep. No. 903, at 10, reprinted in 1986 U.S.C.C.A.N. at 6393).

      Moreover, HCQIA's safe harbor provisions may be waived where the physician makes "no contemporaneous objections to the manner in which the hearing procedures were conducted; section 11112(b) explicitly provides that compliance with its terms is not required if the

17

physician voluntarily waives them." *Id.*

In the present case, Dr. Chalal alleges the Hospital failed to meet the adequate notice and hearing requirement under section 11112(a)(3) because Dr. Chalal was not represented by counsel before the Hearing Committee. (Pl.'s Brief in Response to Def.'s Mot. for Summ. J. at 9-10.) This contention is without merit, for several reasons. Although the Bylaws do not generally provide for representation by counsel at a peer review hearing, the Bylaws give the Hearing Committee discretion to allow legal representation. Specifically, the Bylaws provide as follows:

> The hearings provided for in these Bylaws are for the purpose of resolving, on an intra-professional basis, matters bearing on professional competence and conduct. Accordingly, neither the affected member nor the Executive Committee or the Board of Trustees shall be represented at the hearing by an attorney, *unless the Hearing Committee, in its sole discretion, permits both to be represented by counsel.* The foregoing shall not be deemed to deprive the member, the Executive Committee or the Board of Trustees, of the right to legal counsel in preparations for the hearing or for a possible appeal.

(Bylaws at 28, Art. VIII, Section 1, ¶ D (emphasis added).)

It is undisputed Dr. Chalal never requested that his attorney be allowed to appear before the Hearing Committee, or otherwise made an objection as to representation by counsel. (Chalal Dep. at 27-28.) Dr. Chalal was represented by his current attorney, Lindsey Davis, Esq., as early as October 24, 1996, but he did not request that she be allowed to represent him at the hearing on December 20, 1996. (*Id.*) Because the Bylaws expressly grant the Hearing Committee discretion to allow counsel, and Dr. Chalal never asked for this allowance, Dr. Chalal has waived any claim that the Hospital failed to allow him the right to counsel.

18

In addition, the court concludes that the Bylaws' preference for conducting hearings without representation by counsel, was fair under the circumstances of this case.  Consistent with the Bylaws, the Hearing Committee did not conduct the hearing with technical legal rules for the introduction of evidence, but rather allowed Dr. Chalal to present any evidence he desired.  Moreover, the Bylaws also allowed Dr. Chalal to be represented by another member of the medical staff at the hearing, but Dr. Chalal did not seek representation by one of his colleagues.  (Bylaws at 31, Art. VIII, Section 6, ¶ D.)

Dr. Chalal also claims that the Hearing Committee members were biased because some of the physician members had been involved in some of the cases at issue. (Pl.'s Brief in Response to Def.'s Mot. for Summ. J. at 10-11; Chalal Dep. at 179.)  However, Dr. Chalal never objected to the makeup of the Hearing Committee during the hearing process, and thus cannot rely on this complaint to show that the hearing procedures were inadequate.  (Chalal Dep. at 179.)  Dr. Chalal also failed to present any evidence that the alleged bias or hostility of the Hearing Committee members affected the outcome of the peer review process.  Moreover, because the reasonableness test for HCQIA immunity is an objective standard, any alleged bias or hostility is "irrelevant to the reasonableness standards of § 11112(a).  The test is an objective one, so bad faith [of individual peer reviewers] is immaterial.  The real issue is the sufficiency of the basis for the Hospital's actions." *Bryan v. James E. Holmes*, 33 F.3d at 1335 (quoting *Austin*, 979 F.2d at 734).  The court concludes that the Hospital's notice and hearing procedures complied with HCQIA's safe harbor provision in section 11112(b), and in addition were "fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3).

(4)     *The Hospital Acted In The Reasonable Belief That The Action Was Warranted By The Facts Known After Such Reasonable Effort To Obtain Facts And After Meeting The Notice And Hearing Requirements*

Finally, Dr. Chalal has offered no evidence that would suggest the Hospital did not act "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)." 42 U.S.C. § 11112(a)(4). The record reflects that the Hospital clearly had a factual basis for its decision. Dr. Chalal concedes that the medical incidents at issue occurred. (Chalal Dep. at 40-52, 55-86, 95-138.) Essentially, Dr. Chalal's objection to the Hospital's decision is that he disagrees with the ultimate recommendation of the physicians sitting on the various peer review committees. This court may not substitute its judgment for that of the Hospital's peer review committees, however, and Dr. Chalal has failed to offer any evidence to rebut the presumption that the Hospital acted in accordance with 42 U.S.C. § 11112(a)(4).

(5)     *Summary*

In summary, Dr. Chalal has failed to produce any evidence which would rebut HCQIA's presumption of immunity. The record is devoid of any evidence that considerations other than the medical competency of Dr. Chalal were involved in the termination of his privileges. Nothing in the record shows that the action taken against Dr. Chalal was for any reason other than concern for the hospital's patients and the standard of medical care provided by the hospital. Accordingly, the Hospital is immune from any liability for monetary damages arising from its termination of Dr. Chalal's staff privileges or its reporting the adverse decision to the National Practitioner Data Bank, and the Hospital is entitled to judgment as a matter of law as to Counts One and Two of the complaint. 42 U.S.C. § 11111(a)(1).

## IV.  TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

In Counts Two and Four of the Complaint, plaintiff alleges defendant intentionally interfered with his contractual relations with the defendant Hospital, other hospitals, and his patients.  (Complaint at 6, 8, ¶¶ 20-23, 28-29.)  In *Gross v. Lowder Realty Better Homes & Gardens,* 494 So.2d 590 (Ala. 1986), the Alabama Supreme Court explained the elements which must be established to support a claim of tortious interference with contractual relations or business relations in Alabama:

> (1) The existence of a contract or business relation;
> (2) Defendant's knowledge of the contract or business relation;
> (3) Intentional interference by the defendant with the contract or business relation;
> (4) Absence of justification for the defendant's interference; and
> (5) Damage to the plaintiff as a result of defendant's interference.

*Gross v. Lowder,* 494 So.2d at 590.  However, justification is an affirmative defense to be pleaded and proved by the defendant.  *Id.* at 597; *see also Soap Co. v. Ecolab, Inc.,* 646 So.2d 1366, 1371 (Ala. 1994.)  "Generally, whether the defendant is justified in the interference is a question to be resolved by the trier of fact."  *Soap Co.,* 646 So.2d at 1371.  The court finds that plaintiff has failed to establish the elements necessary to support each of his allegations of intentional interference with contractual relations.

Plaintiff alleges that the defendant illegally interfered with his contractual rights under the Medical Staff Bylaws, and such actions ultimately led to his loss of privileges with defendant. (Pl.'s Response in Opp. to Def.'s Amended Mot. for Summ. J. at 5.)  Specifically, "plaintiff submits that Defendant allowed and participated with third parties to tortuously [sic] interfere and acted in concert with the various committees by interfering through Defendant's agent Christine Stewart."  (*Id.* at 6.)  The alleged unlawful actions cited by plaintiff include: (1) failing

21

to provide notice or documentation of all the charges being considered in a timely manner; (2) failing to consider certain information supplied to Christine Stewart; (3) failing to provide documentation or notice of the occurrence reports addressing his substandard care; (4) allowing the process by which he was terminated to become tainted with bias; (5) "bootstrapping" new charges to the initially stated charges; (6) denying him the right to the presence of counsel at the hearing; (7) failing to present adverse witnesses to substantiate the claims so that he was denied the right to cross-examine those making the allegations; (8) failing to give him notice of or the opportunity to respond to certain information provided to hearing committee members at meetings held prior to the hearing; (9) treating him differently than other members of the medical staff; and (10) utilizing an incorrect burden of proof at the hearing. (*Id.* at 6-7.) Plaintiff also alleges that the defendant illegally interfered with his contractual rights regarding his potential employment with Helen Keller Hospital and others. (*Id.* at 9.) Plaintiff contends that defendant's refusal to send reference information to other hospitals where plaintiff sought privileges without plaintiff signing a release constitutes an intentional interference with his contractual relations. (*Id.* at 8-9.) In Count Four, plaintiff also alleges that defendant intentionally interfered with his contractual relationship with his patients. (*Id.* at 9; Complaint at 8, ¶ 28.)

Plaintiff's claims as to tortious interference with contractual relations fall into three categories: (1) plaintiff's contractual relations with the defendant hospital; (2) plaintiff's contractual relations with Helen Keller Hospital; and (3) plaintiff's contractual relations with his patients. The court will address them in turn.

22

*(1) Interference With Plaintiff's Own Contract with Defendant*

As to claims of tortious interference involving the parties to the contract at issue, the

Alabama Supreme Court has explained:

> [a]lthough the torts of interference with contractual relations . . . and interference
> with business relations . . . are recognized under Alabama law, the alleged
> tortfeasor, by definition must be independent of, or a third party to, the particular
> relation. . . . It is well settled that a party to the "relation" cannot be held liable for
> interference with that relation.

*Harrell v. Reynolds Metals Co.,* 495 So.2d 1381, 1387-88 (Ala. 1986) (citations omitted).

Further, "corporate officers or employees may individually commit the tort of intentional

interference with business or contractual relations to which their corporation or employer is a

party" only where those officers or employees "were acting outside the scope of their

employment and were acting with actual malice." *Perlman v. Shurett,* 567 So.2d 1296, 1297

(Ala. 1990) (citations and quotation marks omitted).

Because a claim for tortious interference is not recognized under Alabama law as between

the parties to the contract at issue, plaintiff's claim of intentional interference with contractual

relations regarding his contract with the Hospital is due to be dismissed as a matter of law. *See*

*Hickman, v. Winston County Hospital Board,* 508 So.2d at 238. Plaintiff alleges that defendant's

agent, Christine Stewart, acted in concert with the various committees to tortiously interfere with

his contractual relations. (*Id.*) Plaintiff has not sued any officer or employee in his or her

personal capacity, nor has he offered any evidence indicating that any officer or employee of the

defendant corporation was acting outside the scope of employment or was acting with actual

malice.

Plaintiff also alleges that the defendant hospital "allowed and participated with third parties" to tortiously interfere with his contractual relations. (Pl.'s Response in Opp. to Def.'s Amended Mot. for Summ. J. at 6.) Yet there is no evidence in the record demonstrating such interaction between the defendant and any third party. Plaintiff's claims bear a stronger resemblance to a breach of contract claim. However, as the Alabama Supreme Court has acknowledged, "[b]reach of contract does not give rise to an action for the tort of intentional interference with business or contractual relations." *Hickman v. Winston County Hospital Board,* 508 So.2d at 238 (citations omitted). Thus, this claim is without merit and defendant is entitled to judgment as a matter of law.

*(2) Interference With Plaintiff's Contractual Relations With Helen Keller Hospital*

Dr. Chalal's argument that the defendant Hospital is liable for requiring a release before sending a negative letter of reference to Helen Keller Hospital is also without merit. Plaintiff has failed to show any intentional interference on the part of the Hospital. The Hospital owed no duty to send a letter of reference to another hospital, and Dr. Chalal has offered no legal support for this contention. In light of the negative nature of the letter of reference, which Dr. Chalal admits he would not have wanted the Hospital to send, the Hospital was justified in requiring Dr. Chalal's consent and authorization before sending the letter of reference. Thus, plaintiff has failed to show any evidence that defendant intentionally interfered with the contractual relations between plaintiff and Helen Keller Hospital.

In addition, Dr. Chalal can show no damages arising out of the Hospital requiring the limited release prior to sending the negative letter of reference. There is no evidence that Helen Keller Hospital would have granted him staff privileges had the negative letter of reference been

24

sent. Furthermore, Dr. Chalal admits that he never responded to the Hospital's request for a release and consent for the negative letter, and made no attempts to communicate with the Hospital concerning any objections he had with either the letter of reference or the release.[10] Thus, defendant is entitled to judgment as a matter of law on this claim as well.

### (3) Interference With Plaintiff's Contractual Relations With His Patients

In Count Four, plaintiff alleges that defendant intentionally interfered with his contractual relations with his patients. He also alleges that representatives of the Hospital made false and defamatory statements to his patients after his privileges were not advanced to active status. (Complaint at 8-9, ¶¶ 28-29; Pl.'s Response in Opp. to Def.'s Amended Mot. for Summ. J. at 9.) The only evidence offered by Dr. Chalal in support of this claim were the affidavits of six patients, Carol Higgins, Thomas Ragsdale, Bessie Searcy, Beatrice J. Ricketts, Theresa Brewer, and Barbara Adams.

After plaintiff first submitted these affidavits on August 23, 1999, the Hospital moved to strike the affidavits on the ground that plaintiff failed to identify these witnesses before the discovery cutoffs established by this court's scheduling order.[11] These witnesses were not identified in Dr. Chalal's initial disclosures, as required by Fed. R. Civ. P. 26(a)(1), and Dr.

---

[10]Dr. Chalal also offers no support for his claim that the release was a "general release" which would have absolved the Hospital of any liability from its credentials decision. A cursory reading of the release shows that it is not a general release but rather is a limited release of liability arising out of sending the negative letter of reference. The release expressly states that it relates to "any liability in connection with the attached letter of reference," and accordingly Dr. Chalal's assertion that the release was a "general release" is factually incorrect.

[11] Supplementation of disclosures and discovery were due by June 1, 1999, and all discovery was ordered to be complete as of June 30, 1999.

Chalal also failed to respond to the Hospital's specific interrogatories requesting the name, address, and telephone number of each patient to whom the defendant allegedly made false and defamatory comments and encouraged to see another physician.  In addition, when Dr. Chalal was asked for similar patient information during his deposition, he named only two patients and could not provide locating information, stating only that the patients had moved out of state. (Chalal Dep. at 203-05.)  Because plaintiff did not produce the names of these witnesses prior to the discovery cutoff deadline, the court finds that the Hospital's motion to strike all of the proffered affidavits is due to be granted.

Even if the court were to consider these affidavits, they would not change the conclusion that summary judgment is due to be granted as to this claim.  Plaintiff has failed to establish the element of intentional interference on the part of the defendant.  The majority of the affidavits simply state that when patients of Dr. Chalal sought admission to the Hospital, the Hospital necessarily informed them that Dr. Chalal could no longer admit patients to the Hospital and they would need to get another doctor in order to be admitted.  (*See* Affidavits of Thomas Ragsdale, Carol Higgins, Bessie Searcy, and Beatrice J. Ricketts.)   Only the Affidavits of Barbara Adams and Theresa Brewer state that Hospital employees went beyond simply informing the patient that Dr. Chalal could no longer admit patients to the Hospital.  Barbara Adams stated that while she was seeking admission to the Hospital, unnamed Hospital employees told her "that Dr. Chalal could not practice there at the Hospital and I needed to find a new doctor."  (Affidavit of Barbara Adams, attached to Supp. Sub. to Pl.'s Second Evid. Sub. in Response to Def.'s Mot. for Summ. J. and Pl.'s Opp. Thereto.)   This statement is not false.  Ms. Adams also stated that she was told that Dr. Chalal "was not a good doctor and did not know how to take care of his patients." (*Id.*)

26

Theresa Brewer stated that while she was in the Hospital's emergency room with her grandson, she overheard two unnamed women in "blush-purple scrubs" say that "they didn't know how anybody could go to Dr. Chalal, that he didn't do good." (Affidavit of Theresa Brewer, attached to Pl.'s Second Evid. Sub. in Response to Def.'s Mot. for Summ. J. and Pl.'s Opp. Thereto.)

The court is of the opinion that these affidavits do not lay an evidentiary foundation sufficient to bind the Hospital or charge it with responsibility for the alleged statements. Further, plaintiff has failed to establish any *intentional* interference on the part of the Hospital employees. Dr. Chalal has also failed to produce any evidence that he was damaged by the statements. Dr. Chalal's claim for tortious interference with contract fails as a matter of law without proof of damages. *See Gross v. Lowder Realty Better Homes & Gardens*, 494 So. 2d 590 (Ala. 1986).

## V. DEFAMATION

In Count Three, plaintiff alleges that he was defamed by statements made by hospital representatives to patients after his privileges were not advanced to active status. (Complaint at 6-7, ¶¶ 24-26; Pl.'s Response in Opp. to Def.'s Amended Mot. for Summ. J. at 9.) To establish a defamation claim under Alabama law, a plaintiff must prove:

(1)     a false and defamatory statement concerning the plaintiff;
(2)     an unprivileged communication of that statement to a third party;
(3)     fault amounting at least to negligence on part of the defendant; and
(4)     either actionability of statement irrespective of special harm or the existence of special harm caused by publication of the statement.

*McCaig v. Talladega Publishing Co.,* 544 So. 2d 875, 877 (Ala.1989) (citing Restatement (2d) of Torts § 558 (1977)); *see also Wyatt v. BellSouth, Inc.*, 998 F. Supp. 1303, 1312 (M.D. Ala. 1998).

In *Anderton v. Gentry*, 577 So. 2d 1261 (Ala. 1991), the Alabama Supreme Court held that statements which do not impute the commission of a crime involving infamy or moral turpitude

27

require proof of actual damages in order to support a claim for defamation, explaining as follows:

> Generally, in slander there must be an oral communication of a defamatory matter to a third person. . . .  There are two types of slander, that is, slander per se and slander per quod.  Slander per se is actionable if it imputes to the plaintiff an indictable offense involving infamy or moral turpitude. . . .  Damage is implied by law when spoken words are found to be slander per se.  Slander per quod is a communication to a third person of a defamatory statement subjecting the plaintiff to disgrace, ridicule, odium, or contempt although not imputing the commission of a crime involving infamy or moral turpitude.

*Anderton v. Gentry,* 577 So. 2d at 1263 (citations omitted).

In the present case, the alleged statements do not accuse Dr. Chalal of committing an indictable criminal offense involving infamy or moral turpitude and therefore, at worst, constitute slander per quod.  Therefore, Dr. Chalal must present evidence of actual damages.

Dr. Chalal, however, has produced no evidence that he lost a single patient visit or was otherwise damaged as a result of the alleged statements.  To the contrary, Dr. Chalal admitted during his deposition that he knows of no patients who stopped seeing him as a result of any alleged remarks by the Hospital. (Chalal Dep. at 205.)  Without evidence of damages, Dr. Chalal's defamation claim fails as a matter of law.[12]

## VI. ANTITRUST VIOLATIONS

Count Six of plaintiff's complaint alleges that defendant violated the antitrust laws in that "Defendant, by its actions . . . intentionally restrained, or attempted to restrain, and monopolized, or attempted to monopolize, the medical services provided to Franklin County residents and others in that geographic area proximately by thwarting, destroying or otherwise interfering with

---

[12] In light of the absence of damages, the court need not reach the defendant's argument that the statements were conditionally privileged under Alabama law. *See Fulton v. Advertiser Co.*, 388 So. 2d 533, 537 (Ala. 1980).

Plaintiff in his practice of medicine."[13]  (Complaint at 10-11, ¶ 36; Pl.'s Response in Opp. to

Def.'s Amended Mot. for Summ. J. at 14.)  Section 1 of the Sherman Act provides that "[e]very

contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or

commerce among the several States, or with foreign nations, is declared to be illegal."  15

U.S.C.A. § 1.  Thus, in establishing a section 1 claim,"plaintiff must prove an agreement

between two or more persons to restrain trade, because unilateral conduct is not illegal under

section 1."  *Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir.

1996) (citations omitted).  Further, such agreement must unreasonably restrain trade.  *Id.*

Section 4 of the Clayton Act provides a private cause of action for violations of the

Sherman Act, stating:

> any person who shall be injured in his business or property by reason of anything
> forbidden in the antitrust laws may sue therefor in any district court of the United
> States in the district in which the defendant resides or is found or has an agent,
> without respect to the amount in controversy, and shall recover threefold the
> damages by him sustained, and the cost of suit, including a reasonable attorney's
> fee.

15 U.S.C.A. § 15.  Thus, the prerequisites to a private cause of action under § 4 of the Clayton

Act include: (1) a violation of the antitrust laws, in this case section 1 of the Sherman Act, (2)

injury to "business or property," and (3) a causal relationship between the antitrust violation and

the injury.  *National Independent Theatre Exhibitors, Inc. v. Buena Distribution Co.*, 748 F.2d

---

[13]Plaintiff alleges in his complaint and in his brief submitted to the court that defendant
monopolized or attempted to monopolize medical services.  (Complaint at 10-11, ¶ 36; PL.'s
Response in Opp. to Def.'s Amended Mot. for Summ. J. at 14-15.)  However, plaintiff only cites
Section 1 of the Sherman Act for the basis of his claim and offers no evidence whatsoever
relating to the elements necessary to support a claim of monopolization.  It is clear that both
parties agree that any claims relating to antitrust violations fall within section 1 of the Sherman
Act.  Therefore, any claims pertaining to monopolization are due to be dismissed.

602, 607 (11th Cir. 1984).  Here, plaintiff has suffered no antitrust injury as a result of the alleged violations of the Sherman Act, and further, he has no standing under the Clayton Act to prosecute these claims.

Defendant is entitled to judgment as a matter of law on plaintiff's antitrust claim because plaintiff has failed to establish an antitrust violation.  In order to establish an agreement under Section 1 of the Sherman Act, plaintiff must demonstrate "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Id.* at 1455-56 (citing *American Tobacco Co. v. United States,* 328 U.S. 781, 810 (1946)) (quotation marks omitted).  Where a plaintiff is forced to rely on circumstantial evidence to support his claim, in order to survive summary judgment, he must "present evidence that reasonably tends to exclude the possibility that the alleged conspirators acted independently." *Id.* at 1456 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.,* 467 U.S. 752, 764 (1984))(internal quotations omitted).  Thus, "conduct as consistent with permissible activity as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986)) (internal quotations omitted).

In *Todorov v. DCH Healthcare Authority,* the Eleventh Circuit noted that under certain circumstances, a hospital and the members of its medical staff are capable of conspiring with one another, and such concerted action is cognizable under section 1 of the Sherman Act.  *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438, 1455 (11th Cir. 1991) (citing *Bolt v. Halifax Hosp. Medical Center,* 891 F.2d 810. 819 (11th Cir.)[14], *cert. denied,* 495 U.S. 924, 110 S.Ct. 1960, 109

---

[14]In *Bolt v. Halifax Hosp. Medical Center*, the defendants were hospitals and members of their medical staff.  However, the medical staff members were not employees of the hospitals, but

30

L.Ed.2d 322 (1990)); *see also Crosby v. Hospital Auth. of Valdosta, and Lowndes County,* 93

F.3d 1515, 1521 (11th Cir. 1996), *Marshall v. Planz,* 13 F.Supp. 1231, 1242-43 (M.D. Ala.

1998). However, the alleged acts in the case at bar simply do not provide any factual basis for

the claim that the Hospital conspired with its medical staff or another entity to restrain trade.

Further, nothing in the record excludes the possibility that the Hospital acted unilaterally, and

procompetitively, in denying Dr. Chalal staff privileges. The ultimate decision to terminate Dr.

Chalal's hospital privileges was that of the Board of Trustees of the Hospital. The Board

retained the definitive and exclusive decisionmaking power over such decision. Plaintiff has

offered no evidence indicating that the Board merely perfunctorily approved the

recommendations of the medical staff committees or in any way conspired with members of the

committees. There is also no evidence indicating that the Board ceded control over the ultimate

decision to any other person or committee.

Additionally, Dr. Chalal has failed to show that the Hospital's actions caused him any

damage, aside from the actions for which the Hospital is immune under HCQIA. *See Marshall v.

Planz*, 13 F. Supp. 2d 1231, 1238 (M. D. Ala. 1998) ("Courts have long recognized that antitrust

claims are tortious in nature, and that common-law principles governing tort claims are equally

applicable to antitrust claims."). Thus, the court is of the opinion that defendant is entitled to

judgment as a matter of law as to plaintiff's antitrust claim.

---

were physicians who practiced medicine in their individual capacities. Thus, each was a
"separate economic entity potentially in competition with other physicians." *Todorov,* 921 F.2d
at 1455 n. 29 (citing *Bolt v. Halifax Hosp. Medical Center,* 891 F.2d 810, 819 (11th Cir. 1991)).

Assuming arguendo that Dr. Chalal has suffered an antitrust violation, his antitrust claim would still fail because he has failed to establish that he has antitrust standing.[15] Courts have struggled in establishing the precise test for determining whether a plaintiff in a private antitrust action has standing. *Todorov*, 921 F.2d at 1449. Nonetheless, the Eleventh Circuit has developed a two-pronged standard under which a court should (1) "determine whether the plaintiff has suffered 'antitrust injury;'" and (2) "determine whether the plaintiff is an efficient enforcer of the antitrust laws, which requires some analysis of the directness or remoteness of the plaintiff's injury." *Id.* Antitrust injury "requires the private antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation . . . increasing the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition." *Id.* at 1450 (citing *Austin v. Blue Cross & Blue Shield*, 903 F.2d 1385, 1389-90 (11th Cir. 1990) (quoting P. Areeda & H. Hovenkamp, Antitrust Law ¶ 335.1, at 261 (Supp. 1987))). Under the second prong, the court is to consider other factors relating to whether the plaintiff is an *efficient* enforcer of the antitrust laws. *Id.* at 1450, 1452 (emphasis added). "[T]he antitrust laws were enacted for the protection of competition not competitors," and where plaintiff's injuries are due to an increase in competition, they are "not the type that the statute was intended to forestall." *Id.* at 1450 (citations and internal quotations omitted). As the court in *Todorov* explained:

---

[15]Normally, when a court concludes that no violation has occurred, it has no occasion to consider standing. *See Levine, M.D. v. Central Florida Medical Affiliates, Inc.,* 72 F.3d at 1545 (citing 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 360f, at 202-203 (rev. Ed. 1995)). However, in this case, the court will consider standing in the alternative.

> Standing in an antitrust case involves more than the "case or controversy" requirement that drives constitutional standing. . . . Thus, antitrust standing is not simply a search for an injury in fact; it involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws. . . . Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws.

*Todorov,* 921 F.2d at 1448 (citations omitted).

In *Todorov,* the Eleventh Circuit concluded that a neurologist who lost certain hospital privileges lacked standing to bring an antitrust claim against the hospital. The court found that the plaintiff doctor's alleged injury, rejection of his application for privileges, was not the "type the antitrust laws were intended to prevent and that flows from that which make the defendants' acts unlawful." *Todorov,* 921 F.2d at 1453 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977)). The court found that the doctor had only shown that he had been deprived of "the profits he would have garnered had he been able to share a part of the [other doctors'] supercompetitive, or monopoly, profits." *Todorov,* 921 F.2d at 1453-54. The court found that this was not an antitrust injury because "the antitrust laws were not enacted to permit one person to profit from the anticompetitive behavior of another person." *Id.* at 1454. Similarly, in the present case Dr. Chalal does not meet the criteria for antitrust standing as outlined above.

The court finds that Dr. Chalal is unable to demonstrate that he suffered an antitrust violation because he failed to demonstrate the existence of an agreement between two or more persons as required under section 1 of the Sherman Act. Even if Dr. Chalal had established an antitrust violation, the court finds that he lacks antitrust standing because this is not the type of injury the antitrust laws were intended to prevent. Thus, defendant is entitled to judgment as a

33

matter of law as to plaintiff's antitrust claim.

## VII. OUTRAGE

Plaintiff alleges he suffered severe emotional distress as a result of defendant's extreme and outrageous conduct.  (Complaint at 9, ¶¶ 31-34.)  Plaintiff cites the following allegations to support his claim for the tort of outrage:

> Since the termination of his privileges, he has been unable to provide continuity of care to his patients, he has been defamed by Defendant's employees to his patients and others in the community; he has been reported to the National Practitioner's Data Bank, he has not been able to have pertinent information sent to other hospitals for possible privileges unless he signs a release of liability to the hospital; he has suffered economically; he has been unable to practice fully his chosen profession and he has sought the services of a psychiatrist to assist him in dealing with the aftermath of his unjustified loss of privileges.

(Pl.'s Response in Opp. to Def.'s Amended Mot. for Summ. J. at 13.)

> In order to establish a claim for the tort of outrage, a plaintiff must prove:
>
> (1) that the defendant's conduct was intentional or reckless;
> (2) that it was extreme and outrageous; and
> (3) that it caused emotional distress so severe that no reasonable person could be expected to endure it.

*Ex parte Crawford & Co.,* 693 (So.2d 458, 460 (Ala. 1997) (citing *American Road Serv. Co. v. Inmon,* 394 So.2d 361, 365 (Ala. 1980)).  As to the second element under such a claim, the Alabama Supreme Court has repeatedly made clear that the tort of outrage is reserved for only the most extreme conduct:  "By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *American Road Serv. Co. v. Inmon,* 394 So.2d at 365 (citations omitted).  Further, the Alabama Supreme Court has acknowledged that the cases in which there has been sufficient evidence to create a jury question under such a claim

34

fit into three categories: those involving "wrongful conduct in the context of family burials," those in which "insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim," and those "involving egregious sexual harassment." *Ex parte Crawford & Co.,* 693 So.2d 458, 460 n.1 (Ala. 1997)(citing *Thomas v. BSE Industrial Contractors, Inc.,* 624 So.2d 1041, 1044 (Ala. 1993))(internal quotations and citations omitted).

Dr. Chalal's factual assertions combined do not fit into any of these three categories, nor do they rise to the level necessary to meet the stringent standards articulated in *Inmon.* Viewing the evidence in the light most favorable to the plaintiff, a jury could not reasonably conclude that defendant's conduct was "beyond all possible bounds of decency, . . . atrocious . . . and utterly intolerable in a civilized society." *American Road Serv. Co. v. Inmon,* 394 So.2d at 365. Thus, the defendant is entitled to judgment as a matter of law as to plaintiff's claim of outrage.

## VIII. INJUNCTIVE RELIEF

Dr. Chalal's complaint purports to seek both monetary damages and injunctive relief. Specifically, the Complaint asks the court to award "injunctive relief in the form of a permanent injunction to require reinstatement of [plaintiff's] admitting privileges and to prevent Defendants from further, in the future, unlawfully denying him such privileges and the right to engage lawfully in the practice of medicine." (Complaint at 5, ¶ 18(D).) Although HCQIA immunity is limited to monetary damages, it does not protect a defendant against injunctive relief. 42 U.S.C. § 11111(a)(1). However, in the case at bar, Dr. Chalal never moved the court for an injunction or otherwise pursued injunctive relief. Thus, the court finds that Dr. Chalal has abandoned his claim for injunctive relief. *See Imperial v. Suburban Hosp. Ass'n, Inc.,* 37 F.3d 1026, 1031 (4th

Cir. 1994) (where plaintiff failed to file a motion for injunctive relief or otherwise suggest to the court that he had a continuing interest in obtaining injunctive relief which would survive the immunity defense, the prayer for injunctive relief was abandoned and the district court properly dismissed the entire complaint). Finally, because Dr. Chalal is not entitled to relief on any of his claims, he would not be entitled to the injunctive relief requested in his complaint.[16]

### CONCLUSION

Plaintiff's prosecution of this lawsuit was a plain attempt to have a court revisit an adverse decision of his medical colleagues and substitute the court's judgment for that of the Hospital's governing board. This is precisely the type of litigation the Health Care Quality Improvement Act was designed to prevent. Plaintiff's evidence raises no genuine issues of material fact regarding plaintiff's claims, and defendant is entitled to judgment as a matter of law. Accordingly, an order granting defendant's motion for summary judgment will be entered contemporaneously herewith.

**DONE** this  31st  day of March, 2000.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

---

[16]Even if Dr. Chalal had pursued injunctive relief, the defendant no longer owns or operates the hospital, and thus the court could not provide the equitable relief plaintiff seeks. (Chalal Dep. at 16-17.)

36